■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ANDREW WILLIAMS, Appellant. [49 NYS3d 671]—

Order, Supreme Court, New York County (Larry R.C. Stephen, J.), entered September 10, 2015, which adjudicated defendant a level three sexually violent offender pursuant to the Sex Offender Registration Act (Correction Law art 6-C), unanimously modified, on the facts and in the exercise of discretion, to the extent of reducing the adjudication from level three to level two, and otherwise affirmed, without costs.

This appeal presents one of the rare cases in which we should exercise our discretion to depart downward from defendant's presumptive sex offender risk assessment level. During his 30 years of incarceration, defendant committed himself to changing his life. At age 52, he is markedly different from the 20 year-old who committed the violent offense that requires his registration. Defendant has completed academic and therapeutic programming that greatly diminish his likelihood of reoffending. His likelihood of reoffense is further decreased by the pain and mobility problems that he has developed. Under these circumstances, we find that the risk assessment instrument (RAI) did not "fully capture" that defendant has demonstrated his ability to be a constructive member of society who does not pose the high level of reoffense characteristic of a level three sex offender (see Sex Offender Registration Act [SORA] Risk Assessment Guidelines at 4).

In 1984, defendant raped and robbed a 22-year old woman on the rooftop of her building. At the time, he had been using phencyclidine (PCP) and marijuana, and suffered from alcohol-

ism. Following his conviction after trial of one count of rape in the first degree and five counts of robbery in the first degree, defendant was sentenced to a term of imprisonment of 15 to 30 years, which was run consecutively to a term of 12½ to 25 years that he received on an unrelated robbery conviction.

In the 30 years since these heinous offenses, defendant has taken major steps to turn his life around. He obtained his GED in 1986, an Associate's degree in 1992, and two Bachelor's degrees, in 2007 in human behavior and in 2008 in organizational management. Defendant also hopes to pursue a law degree. The attorney who assisted him with his parole application has offered to mentor him in this endeavor. She submitted a letter of recommendation in support of his application for a downward departure, the first time she had ever done so, in which she stated that "[h]is narrative illustrates the rehabilitative force of education" and described him as "reliable, respectful and hardworking."

Defendant also took advantage of therapeutic programming related to substance abuse and nonviolent conflict resolution. He completed a 16-week Islamic Therapeutic Substance Abuse Program, the Department of Correction and Community Supervision's Alcohol and Substance Abuse Treatment program, and the Compadre Helper Bilingual Peer Counseling Training Program, in which he acquired counseling skills while receiving therapy for drug and alcohol abuse. Additionally, he participated in the Alternatives to Violence Project (AVP) where he completed basic and advanced nonviolent conflict resolution course work before training to become a program facilitator. Defendant's performance with AVP was praised in a letter of recommendation from a former program facilitator who recognized defendant as a "positive contributor" to the program and a "good influence" on his fellow inmates.*

Defendant has also strengthened his community ties while incarcerated. Defendant communicated by mail with one of his childhood friends who is now a District Manager for the Social Security Administration. In her letter supporting his application, defendant's friend remarked that, through his letters, she has seen defendant "mature[ ] over the years" and she hopes that they remain friends. Defendant also found support in the Islamic community while incarcerated.

Defendant's efforts at rehabilitation have been recognized by two of his correction officers. One officer stated that defendant

---

* In addition to developing counseling skills related to substance use and conflict resolution, defendant also trained to become an HIV/AIDS peer educator.

"deserves a chance" and is "intelligent, possesses insight and is a respectable person." This officer expressed his belief that "[defendant] will not return to prison once released." The other officer, who stated that he normally does not write inmate recommendation letters but had made an exception for defendant, believed that defendant would "re-enter society successfully and be a contributing member of his community." He added that defendant is the "perfect candidate for any departure."

Defendant's incarceration has also been marked by a decline in his mobility. In 1996, defendant fell down a flight of stairs and suffered multiple disc herniations for which he underwent surgery (see *Williams v Smith*, 2009 WL 2431948, *1, 2009 US Dist LEXIS 69871, *2 [SD NY, Aug. 10, 2009, No. 02 Civ 4558(DLC)]). He continues to suffer from degenerative disc disease in his spine, a bulging disc, and herniation in his back. The results of a 2014 MRI indicated the presence of a "large disc protrusion" causing "spinal stenosis." While incarcerated, defendant has received physical therapy and steroid injections to treat his continued pain. Additionally, his physical therapist has ordered him not to lift more than 10 pounds.

The Parole Board scheduled defendant, then 51 years old, for an open release date of July 21, 2015. Notice of this release date was submitted to the Board of Examiners of Sex Offenders. On July 2, 2015, an examiner scored defendant on the RAI at 135, which placed him at a presumptive level three sex offender adjudication. No departure was recommended.

Defendant appeared for a SORA hearing on September 10, 2015. At the hearing, he did not dispute the calculation of his presumptive risk level. However, defendant moved for a downward departure, arguing that, among other things, his efforts at rehabilitation and his medical condition warranted a departure from his presumptive level three risk assessment. He submitted a number of exhibits, including copies of his degrees and certificates, the letters of recommendation that he had received, and his medical records attesting to his pain and mobility issues. His counsel argued that a level two adjudication would be adequate to monitor defendant because it involved many of the same registration requirements as a level three adjudication. The SORA court recognized defendant's accomplishments but declined to grant a downward departure, citing the seriousness of his underlying offense. We now exercise our discretion to modify defendant's sex offender adjudication from level three to level two.

The Court of Appeals has enunciated a three-step process for

determining whether to depart downward from a defendant's presumptive risk level (*see People v Gillotti*, 23 NY3d 841, 861 [2014]). First, a court must decide whether the proffered mitigating circumstance or circumstances are "of a kind or to a degree not adequately taken into account by the guidelines" (*Gillotti*, 23 NY3d at 861, citing Guidelines at 4). Second, a court must determine whether the defendant seeking a downward departure has proven the existence of these alleged mitigating circumstances by a preponderance of the evidence (*id.* at 864). If the defendant surmounts these first two steps, a court must then exercise its discretion and determine at the final third step, "whether the totality of the circumstances warrants a departure" (*id.* at 861).

Here, we find that, under this three-step analysis, a departure to level two is warranted. Initially, we note that defendant has met his burden of proving the existence of mitigating circumstances unaccounted for in the Guidelines by a preponderance of the evidence. Defendant's remarkable rehabilitation and his pain and mobility problems constitute, in this case, the sort of "special circumstances" for which a downward departure is appropriate (Guidelines at 4). Moreover, defendant supported his application with a number of exhibits, including his degrees, his medical records, and his letters of recommendation.

While we agree with the calculation of defendant's score on the RAI, it does not accurately depict his current ability to become a productive member of his community. First, while the RAI gives him a zero score under Factor 13, "Conduct While Confined or Under Supervision," this does not adequately capture the exceptional degree to which defendant has worked to rehabilitate himself.

Additionally, defendant was assessed points on other sections of the RAI based on his characteristics at the time of the underlying offense that he has since changed. Defendant received 15 points as to Factor 11 of the RAI, "Drug or Alcohol Abuse," based on his use of marijuana, PCP, and alcohol at the time of the offense. He has since completed multiple substance abuse programs. Defendant received 30 points under Factor 1 of the RAI, "Use of Violence," because he was armed with a gun when he committed the underlying offense. His excellent work with the AVP and his many supporters' belief that he has rehabilitated himself reduce our concerns that he will behave violently again.

Defendant received 15 points under Factor 9, "Number and Nature of Prior Offenses," and 10 points under Factor 10,

"Recency of Prior Felony," based on burglary convictions that he had received not long before committing the underlying offense. However, defendant's many supporters and his own efforts to rehabilitate himself suggest that he changed since committing the underlying offense.

As to defendant's mobility problems, a "physical condition that minimizes [defendant's] risk of reoffense" has been recognized by the Board as a basis upon which to depart downward (Guidelines at 5). Here, defendant's 20 years of ongoing pain and mobility issues make it unlikely that he could commit an act like the one he was convicted of over 30 years ago (*cf. People v Portalatin*, 145 AD3d 463, 464 [1st Dept 2016] [downward departure from level two assessment inappropriate where health problems did not minimize likelihood of recidivism]).

Having concluded that defendant has surmounted the first two steps under *Gillotti*, we turn now to the issue of whether or not a downward departure would be an appropriate exercise of our discretion. In undertaking this analysis, we recognize the important public safety rationale underlying New York State's sex offender registration laws (Correction Law § 168-l [5] [directing the Board to develop guidelines and procedures to assess the likelihood of a sex offender's risk of repeat offending]; *People v Mingo*, 12 NY3d 563, 574 [2009] [Court of Appeals stating that the purpose of SORA is to "protect the public from sex offenders"]). The crime which has required defendant's registration was, as the People described at the SORA hearing and on appeal, undoubtedly serious. However, defendant committed this offense when he was a violent, drug-using 20 year old. He is now a mature 52-year-old man whose time in prison has not only significantly transformed his behavior, but has been marked by a decline in his mobility, bearing on his ability to re-offend. As the Board has recognized, "The ability to depart is premised on a recognition that an objective instrument, no matter how well designed, will not fully capture the nuances of every case" (Guidelines at 4). In this case, the RAI, by scoring defendant for his actions and characteristics from 30 years ago, as it was designed to do, fails to provide a complete picture of the extraordinary changes that defendant has made while incarcerated. Moreover, defendant's changes have directly addressed the factors leading to his level three score on the RAI: his substance use, use of violence, and prior criminal activity.

We also consider that here, defendant has asked us only to depart downward from level three to level two, a designation

that imposes many of the same registration requirements. Both level three and level two offenders are listed on a publicly available electronic database (Correction Law § 168-q [1]) and required to disclose both their home and employment addresses (Correction Law § 168-b [1] [e]); the registry information for both level two and level three offenders is shared with municipal housing authorities (Correction Law § 168-b [12]). Additionally, because defendant's underlying conviction classifies him as a sexually violent offender, he will be subjected to lifetime registration even as a level two offender (Correction Law §§ 168-h [2]; 168-a [3]).

However, as a level two offender, defendant will not be precluded from being located with 1,000 feet of school grounds, which would likely impede his efforts to find stable housing, employment, or even attend law school as he hopes (Executive Law § 259-c [14]; Penal Law § 220.00 [14]). He will also not be required to verify his address in person every 90 days and he will have to provide a current photograph to the registry every three years as opposed to every year (Correction Law §§ 168-f [3]; 168-f [2] [b-2], [b-3]).

Accordingly, we find that a level two sex offender adjudication better reflects the person that defendant has become over these past 30 years. A level three adjudication might jeopardize the important changes that defendant has achieved, while a level two adjudication is adequate to ensure that he does not re-offend and to protect the community. Concur—Acosta, J.P., Renwick, Moskowitz, Feinman and Gesmer, JJ.