# State of New York
# Court of Appeals

MEMORANDUM

This memorandum is uncorrected and subject to revision before publication in the New York Reports.

No. 72  SSM 3
The People &c.,
      Respondent,
    v.
Herman Anthony,
      Appellant.

Submitted by Nancy E. Little, for appellant.
Submitted by Rebecca Nealon, for respondent.

MEMORANDUM:

The order of the Appellate Division should be affirmed, without costs.

In 1988, defendant was convicted after trial of four counts of first-degree rape and four counts of first-degree sodomy, among other crimes, for raping or sexually assaulting

- 1 -

five women in their homes at knifepoint during burglaries that occurred over the course of a year. In anticipation of defendant's conditional release from imprisonment in 2020, the Board of Examiners of Sex Offenders assessed defendant 155 points on the risk assessment instrument (RAI), presumptively designating him a level three sexually violent offender for purposes of the Sex Offender Registration Act (SORA).

Defendant did not dispute the accuracy of the Board's point assessment, but he requested that the court depart downward to risk level two. To that end, defendant argued that he did not present a high risk of sexual reoffense, as evidenced by his positive performance in sex offender treatment and educational programs while incarcerated (including obtaining his general equivalency diploma and college-level education credits), limited history of disciplinary infractions, age at time of release (51 years old), familial support, and his scores on two alternative risk assessment instruments. Defendant also asserted that he would be subject to supervision regardless of his risk designation as part of the terms of his conditional release, and that a level three designation would make it more difficult for him to locate housing.

The People opposed the departure application, arguing that defendant's participation in treatment and programs merely constituted compliance with the programs that "he should be doing" and was "largely . . . already taken into consideration" by the RAI. The People further asserted that although age could be a mitigating factor in some circumstances, defendant's age did not indicate any physical inability to reoffend. The People requested that in light of the "atrocious" and "serial" nature of defendant's crimes, the court adjudicate him a level three offender.

Supreme Court concluded that the People had established the bases for the RAI points by clear and convincing evidence and adjudicated defendant a level three sexually violent offender. With respect to defendant's request for a downward departure, Supreme Court recognized the importance of the risk level determination to defendant and noted that it "spent a lot of time" considering his proffered arguments and evidence. The court ultimately concluded, however, that defendant failed to show by "clear and convincing evidence" that a departure was warranted; that the factors on which defendant relied were "adequately taken into account by the [SORA] guidelines"; and that there was "clear and convincing evidence" he should be designated a level three offender. The Appellate Division affirmed (203 AD3d 1084 [2d Dept 2022]).

A court considering a downward departure from the presumptive risk level indicated by the RAI must first determine whether the mitigating circumstances alleged are "of a kind or to a degree not adequately taken into account" by the risk assessment Guidelines, and second, whether such circumstances have been proven by a preponderance of the evidence (*People v Gillotti*, 23 NY3d 841, 861 [2014]; *see* Sex Offender Registration Act: Risk Assessment Guidelines and Commentary at 4 [2006]). If the defendant meets this burden of proof, the court must then "weigh[] the aggravating and mitigating factors to determine whether the totality of the circumstances warrants a departure to avoid an over . . . assessment of the defendant's dangerousness and risk of sexual recidivism" (*Gillotti*, 23 NY3d at 861; *see People v Knox*, 12 NY3d 60, 70 [2009]).

Defendant correctly notes that Supreme Court stated the incorrect standard of proof applicable to his downward departure request. Defendant did not object to this error during

the course of the SORA hearing, and in any event, the Appellate Division applied the proper "preponderance of the evidence" standard to the downward departure request in affirming Supreme Court's order (*Gillotti*, 23 NY3d at 861).

Defendant also asserts that Supreme Court erred in discounting his proffered mitigation evidence on the ground that those factors had already been taken into account by the RAI. The Appellate Division held that defendant "proved the existence of some mitigating factors not adequately taken into account by the Guidelines," and then proceeded to weigh the aggravating and mitigating factors as required by *Gillotti* (203 AD3d at 1084-1085). Defendant contends it is unclear which mitigating factors the Appellate Division found sufficiently established for purposes of the first and second prongs of the *Gillotti* analysis and, relatedly, whether the Appellate Division disregarded any of his proffered mitigation evidence on the ground that it was adequately accounted for by the Guidelines.

We do not read the Appellate Division order to hold that the Guidelines adequately accounted for any of the mitigating factors identified by defendant. The Appellate Division concluded that "defendant proved the existence of some mitigating factors not adequately taken into account by the Guidelines," but held that "[t]he totality of the circumstances, including the cumulative effect of the factors relied upon by the defendant, did not show that the presumptive risk level overassessed the defendant's risk and danger of reoffense" (203 AD3d at 1084-1085). We understand this language to mean that the Appellate Division credited all of defendant's proffered mitigating factors, but nonetheless concluded

that a downward departure was not warranted.[*]  Thus, we have no occasion on the record presented here to reach the question of when evidence relevant to the assessment of points for a particular risk factor—including an assessment of zero points—may also be appropriately considered as mitigation warranting a downward departure.

Given that the Appellate Division considered all of the circumstances proffered by defendant in mitigation, the only question properly before us is whether defendant was entitled to a downward departure as a matter of law.  In light of the severity, number, and circumstances of defendant's violent sexual crimes—one of which occurred in the presence of a victim's child, whom defendant threatened to kill—the Appellate Division did not abuse its discretion by concluding that defendant poses a high risk to public safety based on the likelihood of or potential harm that could flow from reoffense (*see People v Sincerbeaux*, 27 NY3d 683, 691 [2016]; *Knox*, 12 NY3d at 70).

---

[*] In finding that the Appellate Division declined to consider some mitigating evidence because it was taken into account by the Guidelines, our dissenting colleagues unduly emphasize the first sentence in the Appellate Division's order to the exclusion of the second.  As explained above, we read the order differently, to reflect that the Appellate Division (unlike the SORA court) considered all mitigating grounds, and concluded that a departure was not warranted under *Gillotti's* third prong given the totality of the circumstances.  We therefore do not reach the questions that the dissent addresses regarding SORA's risk assessment methodology, nor do we hold that the assessment of zero points for a risk factor precludes consideration of that same subject matter as grounds for a departure.  Those issues are reserved for another potential case where they are squarely presented.

RIVERA, J. (dissenting):

Under the Sex Offender Registration Act, Correction Law Article 6-C ("SORA"), sentencing courts—based on the record and the presumptive risk level recommendation from the Board of Examiners of Sex Offenders (the "Board")—are responsible for

- 1 -

assessing an offender's risk level for registration and notification purposes. In *People v Gillotti*, we set forth a three-step analytical framework for courts to follow in determining whether to depart from the Board's presumptive risk level recommendation (23 NY3d 841, 861 [2014]). We explained that when a defendant seeks a downward departure from that presumptive level the SORA court must assess whether the mitigating factors the defendant offers in support of a downward departure are "of a kind or to a degree not adequately taken into account by the [SORA] Guidelines" (*id.*). The core issue this appeal presents is whether and to what extent SORA and our precedents, including *Gillotti*, categorically disqualify certain subject matter that the Guidelines consider in calculating an offender's risk level from consideration as a mitigating circumstance supporting a downward departure. Contrary to the majority's conclusion, that question is squarely presented in this appeal.

On the merits, the Appellate Division erroneously failed to consider in mitigation all of defendant's proposed factors because it concluded that some were adequately taken into account by the Guidelines. However, the point allocation structure adopted in the Guidelines considers the aggravating nature of a risk factor, and does not account for its mitigating influence on an offender's potential recidivism. This error infected the court's assessment of defendant's risk level and warrants reconsideration of his request for a downward departure.

I.

THE GUIDELINES

SORA tasked the Board with "develop[ing] guidelines and procedures to assess the risk of a repeat offense by such sex offender and the threat posed to the public safety" and provided an extensive list of factors upon which those guidelines must be based (Correction Law § 168-l [5]). Though SORA did not necessarily require the RAI (or its scoring method), the Board devised this assessment tool, explaining that "[t]he [G]uidelines seek to capture both these elements—the probability of reoffense and the harm therefrom" by adopting an "individualized approach" (Guidelines at 2). The Board further explained that it "opted to create an objective assessment instrument" that assigns numerical values to the risk factors (5, 10, 15, 20, 25, or 30 points, depending on which factor), and calculates the offender's "[presumptive] risk level combining risk of reoffense and danger posed" by totaling up the points the offender scores in each category (Guidelines at 3).[1]

In other words, the RAI establishes a starting point based on the presence of certain aggravating factors which, according to the Board, are positively correlated with both an increased risk of reoffense (an empirical calculation) and public harm (a normative judgment) (*see* Guidelines at 7-18). SORA sets out the duties and responsibilities for each

---

[1] Besides Factors 14 and 15, which relate to the offender's release environment, which "are prospective[,] . . . can readily change," and which are therefore not weighed "as heavily as others[,]" (Guidelines at 6), the Guidelines do not explain why some factors warrant more points than others or how, if at all, these scoring ranges correlate to "the risk of a repeat offense by such sex offender and the threat posed to the public safety" (Correction Law § 168-l [5]).

level of sex offender (*see* Correction Law §§ 168-f [b-1], [b-2], [b-3]; 168-h) but only the Guidelines contain a taxonomy for assessing risk (*see* Guidelines at 3). A point total of 70 points or fewer results in a presumptive level 1 classification; a score between 70 and 110 points renders the offender a presumptive level 2;  and a score of 110 points or more results in a presumptive level 3 (Guidelines at 3).[1]

Thus, a score of zero for a factor indicates the absence of the aggravators associated with that factor. For example, "the Board or court may choose to score zero points" under Factor 11—drug or alcohol abuse—when "the offender abused drugs and/or alcohol in the distant past, but his more recent history is one of prolonger abstinence" (Guidelines at 15).

The factor-specific point assessments are only the starting point. The Guidelines also contain "overrides" which "automatically result in a presumptive risk assessment level of 3." The override applies if any of the following is part of the sex offender's history: "(i) prior felony conviction for a sex crime; (ii) the infliction of serious physical injury or the causing of death; (iii) a recent threat to reoffend by committing a sexual or violent crime; or (iv) a clinical assessment that the offender has a psychological, physical, or organic abnormality that decreases his ability to control impulsive sexual behavior" (Guidelines at 3-4). The Board regards these factors "as overrides (rather than scoring them heavily) because each provides compelling evidence that an offender poses a serious risk to public safety" (Guidelines at 4).

---

[2] The Guidelines do not explain this lopsided distribution (i.e., why level 1 occupies 23% of the scoring range, level 2 10%, and level 3 63%).

Finally, the Guidelines also provide for "departures" from the points-based presumptive risk level if some unspecified "special circumstances warrant" and explain that such departures are "premised on a recognition that an objective instrument, no matter how well designed, will not fully capture the nuances of every case" (Guidelines at 4). At the same time, the Board cautions, "if there was to be a departure in every case, the objective instrument would be of little value" and thus, "the expectation is that the instrument will result in the proper classification in most cases so that departures will be the exception—not the rule" (Guidelines at 4). Before departing upward or downward, the Board or court must conclude "that there exists an aggravating or mitigating factor of a kind, or to a degree, that is otherwise not adequately taken into account by the [G]uidelines" (Guidelines at 4).

Courts must determine a sex offender's designation and classification after reviewing the Board's recommendation, and may depart upward from that classification based on clear and convincing evidence or downward based on a preponderance of the evidence (*see Gillotti*, 23 NY3d at 861-862, 864). Courts may depart only when the RAI either fails to cover a subject or does not do so "adequately" (Guidelines at 4). For example, the Guidelines note that zero points are warranted under factor 2 if there was no sexual contact regardless of whether the sex offender intended otherwise, but advise that "the Board or court may choose an upward departure if it concludes that the lack of points in this category results in an under-assessment of the offender's actual risk to public safety" (Guidelines at 9). The Guidelines provide three other illustrative examples of what the Board and SORA courts may consider in determining whether a departure is warranted.

The first is a "a physical condition that minimizes . . . risk of re-offense, such as advanced age or debilitating illness" (Guidelines at 5). The second is where an offender has admitted that they committed a prior sex offense, but was not convicted of that offense, in which case an upward departure might be warranted on "clear and convincing evidence" that this prior sex crime occurred (Guidelines at 6-7). The third is where an offender convicted as an accomplice should normally be subject to the same scoring as a principal but may receive a downward departure if that conviction "results in an over-assessment of the offender's risk to public safety" (Guidelines at 7).

## II.

## DEFENDANT'S DOWNWARD DEPARTURE REQUEST

Defendant was convicted and sentenced in connection with a series of burglaries and rapes in 1988. In anticipation of his June 2020 release, the Board prepared a Risk Assessment Instrument ("RAI") recommending that defendant be adjudicated a level 3 sexually violent offender based on a score of 155 points, calculated by totaling points assessed for various factors.[2]

Defendant did not object to the Board's points assessment but requested that the SORA court depart down to risk level 2. Under that classification, given his particular

---

[3] The length of time during which offenders must register with law enforcement, frequency with which they must register, and extent of personal information provided to the public increases with each increase in the risk level designation—level 1, evidencing a low risk of reoffense, level 2, a moderate risk, and level 3, a high risk. Offenders with the lowest

circumstances, he would be relieved of his obligation to verify his address with law enforcement every 90 days and have his photograph taken annually for the public database (level 2 offenders need only have a new picture taken every 3 years) (*see* Correction Law §§ 168-f [2] [b-2], [b-3]; 168-h [3]).

Defendant identifies several factors supporting a downward departure. The first is his commitment to self-improvement and the measures he took in prison to that end, including participation in certain educational, vocational and therapeutic efforts as well as his lack of disciplinary history. As an example, defendant noted that he took classes at City University of New York's John Jay College of Criminal Justice, where he earned a grade point average of 3.675 and received commendations from his teachers. He also highlighted his participation in a sex offender treatment program, where his counselors described him as "engaged" not only "in the treatment process" but also "in the therapeutic community," first as head of the service crew and later an education leader, Assistant Community Leader, and Community Leader. He was described as a "role model" for others in the program. As further evidence of his exceptional rehabilitation, defendant also pointed out that, during

---

risk of reoffense—level 1 offenders—are relieved of the duty to register after 20 years while level two and three offenders must register at least once annually for life (*see* Correction Law §§ 168-h, 168-q). Similarly, as the offender's risk level increases, law enforcement provides more and more personal details about the offender to the public (*see generally* Correction Law § 168-l [6]).

his 32 years in prison, he had only been disciplined five times, the last of which had occurred in 2003, approximately 17 years before the hearing.

The second mitigating factor was his advanced age at the time of the hearing, which places him at a lower risk of recidivism. Third is defendant's successful completion of both a two-year sex offender treatment program and a sex offender therapy program. Fourth is his academic and vocational pursuits while in prison. Fifth is his strong family support, which includes his mother and his sister (a nurse), both residents of New York City who maintained frequent contact with defendant throughout his imprisonment and intended to continue supporting him after his release. Sixth, defendant noted that a level 3 classification would subject him to the Sexual Assault Reform Act ("SARA"), Executive Law § 259-c (14), which bars level 3 offenders from coming within 1000 feet of a school. Imposition of this condition would have substantially delayed defendant's release from prison because his mother and sister resided in non-compliant homes in New York City. He further pointed out that a level 2 adjudication would provide the same community notification as a level 3, and that, while the latter would require him to report to the local police every 90 days, he would remain on parole until 2037 which would subject him to more stringent reporting requirements than a level 3 classification.

Defendant also requested that the SORA court consider other modern instruments for assessing his risk of reoffense. Specifically, defendant pointed to the "VRS:SO" (Violence Risk Scale: Sexual Offense), which he characterized as a "valid and reliable" alternate tool that clinicians use to assess the risk of sexual reoffense as well as to measure

the efficacy of treatment.[3] In his case, the VRS:SO showed that defendant had improved during his treatment program and presented a "moderate-low" risk of sexual violence. He directed the Court to the Correctional Offender Management Profiling for Alternative Sanctions ("COMPAS")—an assessment tool used by the Department of Corrections and Community Supervision ("DOCCS")—which found that he was a low risk of felony violence and criminal involvement.

Defendant submitted documentary evidence in support of his application, including: academic records and evaluations beginning with basic reading and math and ending with his college courses; work and vocational evaluations and certificates; his monthly reports from his sex offender treatment program; his prison disciplinary record; and certain data from the United States Bureau of Justice Statistics evaluating the frequency of rape offenses based upon age.

Defendant additionally cited to several studies to support his contention that these factors reduce his risk of recidivism (*see e.g.*, Andrew A.J. Harris and R.K. Hanson, *Sex*

---

[4] The entity which devised the VRS:SO—Psynergy.Ca—describes itself as "a group of psychologists who specialize in forensic risk assessment and the treatment of violence and antisocial behaviours" and describes this risk assessment tool as a "theory based" one that "uses static and dynamic variables to assess sexual offense risk and predict sexual recidivism" (Psynergy.Ca, *Violence Risk Scale Sexual Offense Version (VRS-SO)*, https://psynergy.ca/vrs-so, [last accessed May 27, 2023]. Some courts have looked to VRS:SO scores when evaluating orders under Mental Hygiene Law § 10.09 (d) (*see e.g. Matter of Akgun v State*, 148 AD3d 1613, 1614 [4th Dept 2017] [noting that petitioner's high VRS:SO score suggested a high risk for sexual recidivism]; *Matter of Wright v State, New York State Off. of Mental Health*, 134 AD3d 1483, 1487 [4th Dept 2015] [same]; *Harry W. v State*, 65 Misc 3d 1230(A) at *2 [Supreme Court, Oneida County 2019] [same]).

*Offender Recidivism: A Simple Question,* Public Safety and Emergency Preparedness Canada [2004] at 7 [study concluding that age "had a substantial association with recidivism, with offenders older than age 50 at release reoffending at half the rate of the younger (less than 50) offenders"]; P.A. Lanagan, E.L. Schmitt, and M.R. Durose, *Recidivism of Sex Offenders Released from Prison in 1994*, U.S. Department of Justice, Bureau of Justice Statistics, NCJ 198281 [2003] at 1, 25 [survey reporting that that only 3.3% of offenders who were 45 years or older reoffended within 3 years of release]; R.K. Hanson, *Age and Sexual Recidivism: A Comparison of Rapists and Child Molesters*, Department of the Solicitor General of Canada [2001] at 2, 12 [report finding that, compared with other types of sex offenders, rapists' risk of recidivism diminishes more rapidly with increasing age]; *First Report of the Collaborative Outcome Data Project of the Effectiveness of Psychological Treatment for Sex Offenders,* Sexual Abuse: A Journal of Research and Treatment, Vol. 14, No. 2 [April 2002] at 169 [study concluding that such programs had reduced participants' recidivism rates]; Lois M. Davis, et al., *Evaluating the Effectiveness of Correctional Education: A Meta-Analysis of Programs that Provide Education to Incarcerated Adults* [2013] at xvi, 39, 57, *available at* https://www.rand.org/ pubs/research_reports/RR266.html [last accessed May 27, 2023] [RAND Corporation analysis finding lower recidivism rates among prisoners who were educated in prison]; *Mapping the Landscape of Higher Education in New York State Prison,* The Prisoner Reentry Institute at John Jay College of Criminal Justice [February 2019] at 6-7, *available at* https://justiceandopportunity.org/wp-content/uploads/2020/04/Mapping-the-City-University-of-New-York_April-2020-web-ver.pdf [last accessed May 27, 2023] [study

concluding DOCCS prisoners who attend college in New York prisons have a 50% lower recidivism rate]; Jill S. Levenson and Andrea L. Horn, *Sex Offender Residence Restrictions: Unintended Consequences and Community Reentry*, 9 Just Res and Policy 59, 62 [2007] [observing that "sex offenders who had a positive support system in their lives had a significantly lower recidivism rate and fewer rule violations that those who had negative or no support"]).

During the SORA hearing, defense counsel summarized defendant's application, observing that he "ha[d] journeyed from . . . an illiterate 18-year-old to a person who [was then] attending college in prison and [would] continue to attend . . . when released." She explained that defendant had completed sex offender treatment while maintaining a "remarkable" disciplinary record that included only five disciplinary matters and pointed out that he had no tickets for sexual misconduct. Defense counsel also noted that defendant was 51 years old, had family support, and achieved moderate to low offense scores on the VRS:SO and COMPAS assessment tools.

The prosecution responded that defendant's completion of the sex offender treatment program was obligatory and that he would have been assessed additional points under the RAI had he failed to do so, meaning that the Guidelines already accounted for this. Regarding defendant's age, the prosecutor contended that he was "simply older" than when he went to prison and that age would only become a factor if he had become "decrepit" to the point of being physically unable to commit additional sex offenses. The prosecutor further asserted that defendant had "destroyed lives" and expressed his belief that there was no "sort of mitigating circumstance" that "would make good what

[defendant] did" and that, to commit the offenses defendant had committed, one would "need to be a certain level . . . of sociopath."

Defense counsel reminded the court that defendant had participated in other programs in addition to those required of him, for which the RAI did not account. She further contended that defendant did not have to reach a "decrepit" state before the court could consider his age as a mitigating factor and noted that, according to the empirical studies the defense submitted, there was an inverse relationship between age and the risk of reoffense. Finally, defense counsel reminded the court that its responsibility was not to punish, but to determine defendant's risk of sexual reoffense. She further emphasized that defendant was a "changed person" who did not pose such a high risk.

In an oral ruling, the SORA court assessed 155 points based on the RAI. The court denied defendant's request for a downward departure, finding that a "departure was not proper under the guidelines because these factors have been adequately taken into account by the guidelines already" and that no "clear and convincing evidence" supported a departure. Accordingly, the court adjudicated defendant a level 3 risk and designated him a sexually violent offender.

The Appellate Division affirmed the SORA court's determination, reasoning that the court did not improvidently deny the downward departure under the *Gillotti* framework (*People v Anthony*, 203 AD3d 1084 [2d Dept 2022]). According to the Appellate Division, although "defendant proved the existence of some mitigating factors not adequately taken into account by the Guidelines, . . . the totality of the circumstances, including the cumulative effect of the factors relied upon by the defendant, did not show that the

presumptive risk level overassessed [his] risk and danger of reoffense" (*id.* at 1084-1085).

We granted defendant leave to appeal (38 NY3d 1125).[4]

III.

<u>DEFENDANT'S APPEAL TO THIS COURT</u>

As a threshold matter, on the record before us we may resolve the issue disputed by the parties—whether the Guidelines focus on the presence of an aggravating risk factor and thus do not adequately account for positive outcomes associated with the same factor category. Defendant presented his arguments to the courts below thus preserving the issue, and both courts failed to consider the mitigation aspects of all the factors he relied on.

This failure to recognize the distinction between aggravating and mitigating factors has led to conflicting positions in the lower courts. For example, at times, some courts have treated close family support as a mitigating factor, not adequately accounted for by the Guidelines, that reduces the likelihood of sexual reoffense (*see e.g. People v Davis*, 179 AD3d 183, 188 [2d Dept 2019] [treating "strong family support" as a mitigating factor justifying downward modification to Level 1]; *People v Tineo-Morales*, 101 AD3d 839,

---

[5] Defendant contends that this case presents the question of when, under *Gillotti*, "established mitigating factors [are] 'of a kind or to a degree, that is otherwise not adequately taken into account by the Guidelines' " (quoting 23 NY3d at 861) and objects to the Court's placement of his appeal on our alternative review track (*see* Rules of Ct of Appeals [22 NYCRR] § 500.11[b] ). As I have previously stated, once a majority of the Court votes to maintain the appeal on this track, notwithstanding a party's objection, we must consider the issues in the posture presented (*see People v Rodriguez*, 33 NY3d 956, 958 n 1 [2019] [Rivera, J., dissenting]).

840 [2d Dept 2012] [considering defendant's close family ties when approving downward departure]; *see also People v Vasquez,* 38 Misc3d 408, 417-418 [Sup Ct, New York County 2012] [noting that "stable and supportive environment" leads to greater likelihood of successful rehabilitation and reintegration into the community); *People v Witchley,* 9 Misc3d 556, 557 [Sup Ct, Madison County 2005] [offender's risk of reoffense lowered by "stable living situation"]).

Other courts have concluded the opposite. Indeed, the Second Department, which affirmed the SORA determination here, seems to be at odds with itself on the subject of family support (*compare Davis*, 179 AD3d at 188, *and Tineo-Morales*, 101 AD3d at 840, *with People v Saunders*, 209 AD3d 776, 778 [2d Dept 2022] ["Most of the alleged mitigating circumstances identified by the defendant, including his . . . access to a supportive family upon release, are adequately taken into account by the Guidelines"]; *People v Barrott*, 199 AD3d 1029, 1030 [2d Dept 2021] [noting that "the alleged mitigating factors consisting of the defendant's supportive family . . . were adequately taken into account by the Guidelines"]); *People v Fuhrtz*, 180 AD3d 944, 947 [2d Dept 2020] [same]).

As another example, the First and Second Departments have broadly recognized that an individual's "[r]ehabilitation on the basis of the totality of the record is a mitigating factor that is not taken into account by the Guidelines or the RAI" (*People v Madison*, 98 AD3d 573, 574 [2d Dept 2012); *see also People v Santogual,* 157 AD3d 737, 738 [2d Dept 2018] ["Rehabilitation as evidenced by the totality of the record may, under some circumstances, constitute a proper mitigating factor for a downward departure"]; *People v Washington*, 84 AD3d 910, 911 [2d Dept 2011] [concluding that the RAI did not

adequately account for the defendant's participation in sex offender treatment while in prison]; *People v Williams*, 148 AD3d 540, 543 [1st Dept 2017] [identifying "remarkable rehabilitation" as "the sort of special circumstance( ) for which a downward departure is appropriate," where the defendant supports their application for a downward departure "with a number of exhibits"] [internal quotation marks omitted]).

Rather than resolve the confusion, the majority elides the issue based exclusively on its misinterpretation of the Appellate Division's comment that "[t]he totality of the circumstances, including the cumulative effect of the factors relied upon by the defendant, did not show that the presumptive risk level overassessed the defendant's risk and danger of reoffense" (203 AD3d at 1085). According to the majority, this sentence must mean that "the Appellate Division credited all of defendant's proffered mitigating factors, but nonetheless concluded that a downward departure was not warranted" (majority mem at 4-5). However, the majority ignores that immediately preceding its "totality of the circumstances" conclusion, the Appellate Division held that "the defendant proved the existence of *some* mitigating factors not adequately taken into account by the Guidelines" (203 AD3d at 1084 [emphasis added]). The obvious import of this sentence is that the Appellate Division concluded that the Guidelines already accounted for some of defendant's mitigating factors (*see id.*). Thus, reading both sentences together, the only logical conclusion is that Appellate Division first determined that some—but not all—of the factors identified by defendant were not accounted for and then, based on those factors, the "totality of the circumstances" did not support a downward departure (203 AD3d at 1084-1085). If defendant is correct that the Guidelines do not differentiate between the lack

of an aggravating factor and the presence of a mitigating factor and that intermediate appellate courts are wrongly equating the absence of a risk factor with the presence of a mitigating factor, then the Appellate Division erred in failing to recognize this structural distinction leading it to consider some but not all of the factors presented by defendant in support of his downward departure.

There is no obstacle to resolving the overarching legal question of whether the Guidelines adequately account for mitigating circumstances or measure only aggravating factors. I now turn to the merits of defendant's challenge.[5]

IV.

THE GUIDELINES ASSESS AGGRAVATING, NOT MITIGATING FACTORS

We review the SORA court's denial of defendant's downward departure application for abuse of discretion (*see People v Sincerbeaux*, 27 NY3d 683, 689 [2016]). I agree with defendant that the Guidelines structure focuses on whether there are aggravating factors that increase the risk of an offender's sexual recidivism. As I explain, the Guidelines work in one direction, upwardly graduating an offender's risk level based on increases in points within specific factor categories, but never working downward based on positive,

---

[6] Defendant has not presented a statutory or state constitutional challenge to the validity of the Guidelines, which were created in 1996 and whose 2006 "revisions [did] not change the scoring of the instrument but, rather simply include[d] updated statutory language and clarification" (Guidelines at 1). Therefore, I have no occasion to address those issues.

rehabilitative behavior. The Appellate Division thus abused its discretion by failing to recognize and apply this distinction to defendant's upward departure request.

A.

The analysis begins with our case law and the Board's structural approach. First, nothing in *Gillotti* or the Guidelines prohibits a SORA court's consideration of arguments and evidence that a defendant presents as a mitigating factor supporting a downward departure simply on the ground that the Guidelines cover the same subject matter (23 NY3d at 861). From this incidental overlap, it does not necessarily follow that the Guidelines "adequately" account for the subject matter (*id.*). Put another way, the Guidelines do not necessarily account for a defendant's risk-reducing conduct or external factors but rather document the existence of a risk enhancement condition. Proper assessment of a defendant's risk to reoffend—the ultimate goal of the risk assessment process—requires evenhanded consideration of both aggravating and mitigating evidence. By affirming the lower courts' reference to the former as a basis for disqualifying the latter here, the majority leaves in place a one-way ratchet for SORA risk assessments in contravention of both SORA and our construction of that statute in *Gillotti*.

Second, the Guidelines address recidivism in broad strokes, utilizing vague and conclusory terms. For example, Factor 13 requires the Board to determine whether defendant's conduct while imprisoned was "unsatisfactory" (Guidelines at 16). Similarly, Factor 15 requires it to assess whether defendant's release environment is "inappropriate" (*id.* at 18). These factors are aggravators that, when totaled, may raise the defendant's

presumptive risk level, purportedly on the ground that their presence increases the defendant's risk of reoffense (*see People v Perez*, 35 NY3d 85, 88 [2020]). The Guidelines contemplate departures from this presumptive level predicated on "a recognition that an objective instrument, no matter how well designed, will not fully capture the nuances of every case[,]" but they also caution that the overuse of departures would defeat the purpose of the Guidelines themselves (Guidelines at 4; *see also Perez*, 35 NY3d at 88). Notably, however, the Guidelines suggest no analytical framework for assessing the appropriateness of a departure. *Gillotti* aimed to fill this gap by, as relevant here, requiring that defendants seeking a downward departure first proffer mitigating factors that "are of a kind, or to a degree, not adequately taken into account by the guidelines" (23 NY3d at 861). This phraseology merely tracks that of the Guidelines themselves (*compare id.*, *with* Guidelines at 4). *Gillotti* therefore did not expound on when the Guidelines "adequately" account for the defendant's mitigating factors and the sweep of this term is therefore the central issue on this appeal (23 NY3d at 861).

Third, even if the Guidelines consider each respective factor's subject matter when considering the presence of aggravators, *Gillotti* does not compel that same subject matter's disqualification from consideration in a mitigation analysis conducted as part of a downward-departure application. At an abstract level, the absence of some characteristic, attribute, or event necessary to trigger one consequence does not foreclose the possibility that its presence may trigger another. For example, the presence of family support upon release that would result in zero points assessed under Factor 15, does not logically imply

that a more robust than typical family support structure would not reduce an offender's risk, thereby disqualifying it as mitigation supporting a downward departure.

This is consistent with SORA's overall purpose to accurately assess a defendant's risk of reoffense (*see People v Mingo*, 12 NY3d 563, 567-568 [2009]), and tailor the risk level appropriately (*see People v Francis*, 30 NY3d 737, 742-744 [2018]). The Guidelines Commentary provides that the Guidelines were based on "a careful reading of" SORA which requires that the Guidelines "eschew *per se* rules" in order to promote an "individualized" risk assessment (Guidelines at 2). In accordance with this same purpose, *Gillotti's* framework for evaluating upward- and downward-departure applications was driven by an objective "to avoid an over- or under-assessment of the defendant's dangerousness and risk of sexual recidivism" (23 NY3d at 861).

The prosecution interprets the first step of *Gillotti* to mean that "a score of zero" in an RAI risk category "operates to the defendant's benefit" so that "the absence of that factor should not be counted again as a reason for departure." For example, the prosecution contends, a defendant who avoids disciplinary action in prison is assessed zero points under Factor 13 and a court considering a downward departure application should therefore not consider an exemplary disciplinary record as part of its analysis. However, this interpretation of the RAI's assessment of the Guidelines' factors and *Gillotti* is inconsistent with SORA's overall purpose, which is "to assess the risk that a sex offender will reoffend and the likely harm that would be inflicted upon the reoffense" (*Perez*, 35 NY3d at 87). The SORA risk assessment methodology the prosecution argues is required by *Gillotti*— the methodology the majority now upholds—yields an inaccurate picture of this risk by

overassessing aggravators and underassessing mitigators. The legislature could not have intended such a reading of its SORA regime, nor could the Board have intended a construction of the Guidelines that effectively would render the entire enterprise of risk assessment "meaningless and useless" (*Ivey v State*, 80 NY2d 474, 481 [1992]).

This reading of *Gillotti* also misunderstands concepts of risk assessment and risk management generally. To take a topical example, under certain regulations passed pursuant to the Dodd-Frank Act passed in the wake of the 2008 global financial meltdown, the Federal Reserve reviews annual supervisory stress tests of the nation's largest banks and, as part of systemic risk management, sets minimum capital requirements for each large bank (*see* 12 CFR 225.8 [f], 238.170 [f]; *see e.g.* Board of Governors of the Federal Reserve System, *Large Bank Capital Requirements* [Aug 2022], *available at* https://www.federalreserve.gov/publications/files/large-bank-capital-requirements-20220804.pdf [last accessed May 27, 2023]). And, of course, in measuring systemic risk, the Fed accounts, not just for past and projected losses—which aggravate systemic risk—but past and projected gains—which mitigate such risk (*see* Board of Governors of the Federal Reserve System, *2022 Supervisory Stress Test Methodology* [March 2022], *available at* https://www.federalreserve.gov/publications/2022supervisory-stress-test-methodology-overview-modeling-framework.htm [last accessed May 27, 2023]). This approach provides regulators with a full picture of risks the bank poses to the financial system and is crucial to maintaining a functioning, balanced system of credit. A stress test that overassessed gains and resulted in lower capital requirements would increase the risk of large bank failures that could result in a financial panic; on the flip side, a test that

overassessed losses would result in higher capital requirements that would restrict credit availability, which would increase the risk of recession (*see generally* Pablo D'Erasmo, *Are Higher Capital Requirements Worth It?*, Federal Reserve Bank of Philadelphia [Q2 2018], *available at* https://www.philadelphiafed.org//media/frbp/assets/economy/articles/economic-insights/2018/q2/eiq218-capital_requirements.pdf [last accessed May 27, 2023]).

Finally, this conception of *Gillotti* comes at a tremendous cost to offenders seeking reintegration into society following release. "Unquestionably, SORA imposes significant burdens on a registrant, regardless of risk level" (*People v Gravino*, 14 NY3d 546, 556 [2010]) but those burdens increase with the offender's risk level (*see* Correction Law §§ 168-1 [6]). The Court has held "that the entire SORA statutory scheme is designed to have a remedial and non-penal effect" and that its registration and notification requirements do not amount to punishment (*People v Buyund*, 37 NY3d 532, 540, 541 n 5 [2021]). The prosecution's approach to sex offender risk assessment, adopted by the courts below, frustrates whatever remedial ends SORA serves.

## B.

Here, Supreme Court erred in rejecting defendant's proffered mitigating circumstances as "adequately taken into account by the [G]uidelines" under Factors 13 and 15. Defendant's lack of disciplinary infractions since 2003 that earned him zero points under Factor 13 should not have disqualified his other numerous achievements in prison from consideration in the downward-departure analysis. Nor should the fact that he had

support structure upon release—which earned him zero points under Factor 15—have disqualified the strength of that support structure from consideration in the SORA court's downward-departure analysis.

Defendant also argued to the SORA court and the Appellate Division that his post-release supervision provided some forms of supervision more stringent than those required of him as a level 3 offender. For example, he contended, a level 2 designation would have required him to provide the same community notification as a level 3 designation and, although level 2 offenders need only report once per year while level 3 offenders must do so every 90 days, the reporting requirement is inconsequential for him, given that he will be on parole until 2037 and will be required to report more frequently than every 90 days until that time anyway (*see* Correction Law § 168-f). The only additional restriction a level 3 designation imposes would be the Sexual Assault Reform Act's ("SARA") prohibition against entering within 1000 feet of the many places in New York City where children are likely to congregate and, given the lack of SARA-compliant housing in New York City, he would likely remain in prison beyond his release date (*see* Executive Law § 259-c [14]; *People ex rel. Johnson v Supt., Adirondack Correctional Facility*, 36 NY3d 187 [2020]).

The SORA court failed to consider defendant's actual supervision environment because such is "not adequately taken into account by the [G]uidelines" (*Gillotti*, 24 NY3d at 861). Although the Guidelines instruct that defendants are assessed points under factor 14 based on whether, upon release, they will "be supervised by a . . . parole officer who oversees a sex offender caseload or who otherwise specialized in the management of such

offenders[,]" the Guidelines do not mention the impact of parole on SORA's differing reporting requirements for different levels of offenders (Guidelines at 17). Nor do the Guidelines at all address the impact of SARA on level 3 offenders.

V.

CONCLUSION

The ostensible purpose of SORA determinations is to accurately assess risk to ensure public safety. Pursuant to its statutory authority, the Board established a rigid rubric of aggravating factors. But, as the Board recognizes, "an objective instrument, no matter how well designed, will not fully capture the nuances of every case" (Guidelines at 4). Put simply, under the Guidelines structure, the absence of an aggravating factor is not tantamount to the presence of a mitigating factor for which the Guidelines already account. The SORA court here treated these as equivalent and I would therefore reverse the Appellate Division's order and remit to Supreme Court for a proper risk assessment that includes fair consideration of defendant's mitigating evidence.

On review of submissions pursuant to section 500.11 of the Rules, order affirmed, without costs, in a memorandum. Judges Garcia, Singas, Cannataro, Troutman and Halligan concur. Judge Rivera dissents in an opinion, in which Chief Judge Wilson concurs.

Decided June 15, 2023